Michael J. Ward, Esq., SBN 022782
Law Offices of Michael J. Ward, PLC
1300 N. McClintock Drive, Suite B-4
Chandler, Arizona85226
Tel: (480) 235-7600 Fax: (480) 361-6452
E-mail: mjward@cox.net

Kelly LoCascio, Esq., SBN 022793
LoCascio Law Group, PLLC
9203 N. 127th Street
Scottsdale, Arizona85259
Tel: (480) 220-1188 Fax: (480) 247-4415
E-mail: kelly@locasciolawgroup.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DEON CHRISTENSEN, a widowed woman,<br><br>Plaintiff,<br><br>v.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA, MEDNAX SERVICES, INC.; DOES 1 THROUGH 100, INCUSIVE,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

DEON CHRISTENSENfor her complaint against SUN LIFE ASSURANCE COMPANY OF CANADA, MEDNAX SERVICES, INC., and DOES 1 through 100, inclusive (collectively "Defendants"), alleges as follows:

**JURISDICTION AND VENUE**

1. DEON CHRISTENSEN's claims "relate to" an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. §§1001 et seq. This Court has jurisdiction over this action under ERISA, pursuant to 29 U.S.C. § 1132(e), (f), and 28 U.S.C. § 1331.

2. Venue is proper in this district under 29 U.S.C. §1132(e)(2), because the acts complained of occurred in this district and, under ERISA, Defendants are "found" in this district.

**PARTIES**

3. DEON CHRISTENSEN ("Mrs. Christensen"), is, and at all times relevant hereto was, a resident of the City of Gilbert, County of Maricopa, State of Arizona.

4. At all times relevant hereto, Mrs. Christensen was married to Jack Christensen (deceased), an employee of Defendant MEDNAX SERVICES, INC.

5. Mrs. Christensen alleges on information and belief that Defendant SUN LIFE ASSURANCE COMPANY OF CANADA (hereinafter "Sun Life"), is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Massachusetts.

6. Sun Life is, and at all times relevant hereto was, authorized to transact and was in fact transacting the business of insurance in Arizona.

7. Sun Life, at all times relevant hereto, was the Claims Administrator forDefendant MEDNAX SERVICES, INC. Group Term Insurance Policy ("The Plan").

8. Mrs. Christensen alleges that the Plan is an ERISA plan as defined by 29 U.S.C. § 1002.

9. Mrs. Christensen alleges on information and belief that MEDNAX SERVICES, INC. is, and at all relevant times was, the Plan sponsor.

10. Upon information and belief MEDNAX SERVICES, INC.is a Florida corporation with employees working in Arizona and other states.

11. During his employment with MEDNAX SERVICES, INC., Jack Christensen participated in The Plan, including Group Accidental Death Insurance.

12. Jack Christensen listed Mrs. Christensen as the beneficiary of any benefits to be paid under The Plan.

13. On information and belief Sun Life and MEDNAX SERVICES, INC.are both the Claims Administrator and Plan Administrator of The Plan.

14. Accordingly, Sun Life and MEDNAX SERVICES, INC.are fiduciaries of Mrs. Christensen as defined by ERISA as either a "named fiduciary" of The Plan pursuant to 29 USC § 1133(2), a "deemed fiduciary" pursuant to 29 USC § 1002 (21)(A), or a "designated fiduciary," pursuant to 29 USC § 1105(c)(1)(B).

## FACTUAL ALLEGATIONS

15. Mrs. Christensen and Jack Christensen (hereinafter "Decedent" or "Jack") were married for 20 years.

16. On December 5, 2009, Mrs. Christensen found Jack lying unconscious on the floor next to his bed and immediately dialed 911.

17. Jack was pronounced dead at the scene.

18. The Maricopa County Medical Examiner subsequently surmised that Jack's death was the result of an accident caused by the effects of combined prescription medications.

19. Defendants did not request any additional postmortem examinations prior to Jack being buried.

20. Upon receipt of the accidental death ruling by the Maricopa County Medical Examiner, on or about December 18, 2009, Mrs. Christensen submitted a claim for accidental death benefits under The Plan to Sun Life.

21. Sun Life requested additional documents from Mrs. Christensen which were promptly provided.

22. On June 3, 2010, the claim for accidental death benefits was denied by Sun Life.

23. In its adverse determination, Sun Life referred to two exclusions in the Plan as follows:

*"Exclusions*

*No Accidental Death or Accidental Dismemberment payment will be made for a loss which is due to or results from:*

*"... intentionally self-inflicted injuries."*

*"... the Employee's voluntary use of any controlled substance as defined in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as now or hereafter amended, unless administered on the advice of a Physician."*

24. Sun Life concluded that the injuries resulting in Mr. Jack Christensen's death were "reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken and therefore, were not due to accidental means."

25. Sun Life further concluded in its denial of benefits, "[a]dditionally, we recognize that Tramadol is a controlled substance and Mr. Christensen did not possess a prescription for this medication. Mr. Christensen also ingested the prescribed Zolpidem in excess of the therapeutic range and against the manner prescribed."

26. Sun Life did not perform any investigation of its own on the body of Jack Christensen.

27. Sun Life did not perform any independent toxicology tests on the blood extracted from the body of Jack Christensen.

28. Sun Life enlisted a Sun Life physician's assistant, Wendy Haering, to review the Maricopa County Medical Examiner's report.

29. Based on Wendy Haering's recommendation, Sun Life denied Mrs. Christensen's claim for accidental death benefits.

30. On November 30, 2010, Mrs. Christensen submitted a timely appeal to Sun Life.

31. In her appeal, Mrs. Christensen cited to the Maricopa County Medical Examiner's report which concluded the death was accidental.

32. Mrs. Christensen's appeal also set forth her disagreement with Sun Life's self-serving interpretation of the plan language, questioned the qualifications, investigation, and fiduciary responsibilities of Sun Life, as well as the inaccurate interpretation of the toxicology report provided by the Maricopa County Medical Examiner's office.

33. Upon information and belief, Wendy Haering, Sun Life's employee who was charged with interpreting Jack Christensen's toxicology report, is not a toxicologist.

34. In consequence of Sun Life's refusal to utilize competent professionals with the requisite skills to perform the evaluation, Mrs. Christensen's claim for accidental death benefits was inappropriately denied.

35. Despite their fiduciary responsibilities to act in the best interest of Mrs. Christensen, Sun Life never hired a competent professional with the requisite skills to perform the evaluation or conduct a reasonable investigation of the cause of death.

36. As a result of Sun Life's actions, Mrs. Christensen consulted with toxicologist Steven Curry, M.D.

37. Dr. Curry is board-certified by the Medical Toxicology sub-board of the American Board of Medical Specialties.

38. Dr. Curry previously sat on the Board of Directors of the American Board of Medical Toxicology and has 28 years of experience in toxicology.

39. Dr. Curry directs the Department of Medical Toxicology at Banner Good Samaritan Medical Center in Phoenix, Arizona.

40. In preparation for her appeal, Mrs. Christensen asked Dr. Curry to render an opinion with regard to the circumstances related to Jack Christensen's death and Sun Life's conclusions regarding his death.

41. Upon information and belief, Dr. Curry reviewed several medical and scientific journals, the Maricopa County Medical Examiner's report and other documents that were furnished to Sun Life, along with Sun Life's denial of benefits.

42. Dr. Curry refuted the findings of Sun's Life's physician's assistant. He concluded that: (1) Postmortem drug concentrations of zolpidem, hydrocodone, and tramadol found in Dr. Christensen cannot be used, in and of themselves, to determine cause of death; (2) Postmortem drug concentrations of zolpidem, hydrocodone, and tramadol found in Dr. Christensen cannot, in and of themselves, be used to calculate the number of pills that were ingested; (3) Postmortem drug concentrations of zolpidem, hydrocodone, and tramadol found in Dr. Christensen cannot, in and of themselves, be used to conclude that the manner of death was suicide rather than accident; and (4)

tramadol would have played a relatively minor role in contributing to sedation and respiratory depression compared to zolpidem.

43. Dr. Curry reported as follows with regard to Jack Christensen:

> "It is well-established in the scientific literature that blood drug concentrations in postmortem blood are commonly elevated compared to antemortem levels, making their interpretation filled with pitfalls….Given that postmortem blood concentrations of drugs are not known to reflect those at the time of death and are commonly higher than antemortem levels, even in "femoral" blood; and given the overlap between drug levels that produce minimal effects in habitual users who die from unrelated causes and those that are fatal in others; a physician cannot compare drug levels in postmortem blood obtained two days after death, in and of themselves, with "therapeutic" ranges found in living persons to conclude that a toxic effect was necessarily present, or to calculate a dose of drug that was taken in order to produce a postmortem level that was found."

44. Dr. Curry cited multiple sourcesin his report, including Graham Jones, an internationally recognized expert on forensic toxicology and interpretation of postmortem drug concentrations. Quoting Graham Jones, explains regarding the comparison of postmortem drug concentrations to "therapeutic" levels in living persons as follows:

> "However, they (tables of therapeutic drug concentrations) unfortunately perpetuate the myth that the postmortem toxicology results can be interpreted solely using, or heavily relying on so-called 'therapeutic', 'toxic', and 'fatal' ranges," and …it should go without saying that using pharmacokinetic calculations to try to estimate dosage, given a postmortem blood concentration, is of virtually no value and can be extremely misleading … The estimation of dose from postmortem blood concentrations is a practice of the foolhardy."

45. Dr. Curry's report, provided to Sun Life in Mrs. Christensen's appeal,demonstrated the impropriety of Sun Life's conclusion that Jack Christensen had consumed zolpidem in excess of the therapeutic range.

46. Mrs. Christensen further provided Sun Life with a sworn affidavit from herself in which she stated, under oath, that she managed Jack Christensen's zolpidem and that she had given him only one zolpidem pill the evening he died, and certainly not more than two.

47. Mrs. Christensen's affidavit declared that she maintained Jack Christensen's remaining zolpidem in her possession.

48. Mrs. Christensen's appealto Sun Life also included a report from Philip Keen, M.D., a former Maricopa County Medical Examiner. Dr. Keen stated in his report:

> "A definitive interpretation would have been more practical had an autopsy been performed-but without one it is difficult to state the cause of death with certainty."
>
> "I have also reviewed the conclusion expressed by Wendy Haering, PA-C, that, 'The classification of manner of death as an "accident" represents an accepted term in the science of forensic pathology and is not a determination or comment regarding criminal or civil responsibility of any person for the death.' I am not certain what was meant by this statement since as a chief medical examiner in the state of Arizona for more than 34 years, when the pathologist certified the manner of death as 'accident' that was a conclusion based upon review of the evidence and investigation available to the pathologist and implicitly excluded the alternatives of 'natural' and 'Homicide' and 'suicide.'"

49. Mrs. Christensen's appeal provided affidavits from Jack Christensen's friends who knew him well in order to disavow Sun Life's assertion that Jack Christensen's death was reasonably foreseeable.

50. The evidence established the contrary; that Jack Christensen, a doctor himself, took medications, not for the purpose of inducing a fatal injury, but simply to bring relief to a persistent injury that he was receiving treatment for and to get a restful night of sleep.

51. According to the Sun Life policy in effect at the time of Dr. Christensen's death, "Accidental Bodily Injury" is defined as, "bodily harm caused solely by external, violent and accidental means which is sustained directly and independently of all other causes."

52. Based on the Maricopa County Medical Examiner's report, Jack Christensen died as a direct result of an unanticipated toxic reaction to the prescription medication he was taking.

53. The circumstances surrounding Jack Christensen's death fit squarely within Sun Life's definition of "Accidental Bodily Injury" and therefore death benefits are owed to Mrs. Christensen.

54. On January 10, 2011, Sun Life issued its final determination in response to Mrs. Christensen's appeal and supporting documents.

55. Sun Life's benefit determination dated January 10, 2011, once again denied an award of death benefits to Mrs. Christensen.

56. Sun Life's benefit determination states, " … we believe the evidence discloses that Dr. Christensen intentionally consumed excessive amounts of Tramadol, Zolpidem and Hydrocodone, and was not an `Accidental Bodily Injury,' and his death was not by 'accidental means'."

57. Upon information and belief, Sun Life retained Lee Okurowski, MD, MPH, to review Jack Christensen's appeal.

58. Dr. Okurowski acknowledged Sun Life's determination was subject to "problems with interpreting post-mortem blood samples and lack of autopsy." He even stated, "I would concur with Dr. Curry on some of the difficulties in interpreting post-mortem blood samples. Blood drug concentrations in postmortem blood are often elevated compared to antemortem levels."

59. Despite Dr. Okurowski's concession to Dr. Curry's evaluation of Sun Life's inappropriate benefit determination based on postmortem blood analysis, Sun Life chose to deny Mrs. Christensen's claim for accidental death benefits.

60. Mrs. Christensen has satisfied all of the jurisdictional prerequisites, including exhaustion of administrative remedies, to filing an action in federal court.

**COUNT I**
**RECOVERY OF PLAN BENEFITS**
**(Against all Defendants)**

61. Mrs. Christensen incorporates and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

62. A participant is entitled to recover benefits due under the terms of a plan, to enforce rights under the terms of a plan, and to clarify rights to future benefits under the terms of a plan. See 502(a)(1)(B) of ERISA and 29 U.S.C. § 1132(a)(1)(B).

63. Under the terms of the Plan, Defendants agreed to provide Mrs. Christensen, as a beneficiary of Jack Christensen, with Accidental Death and Dismemberment ("AD&D") benefits in the event of Jack Christensen's death.

64. Mrs. Christensen alleges on information and belief that Jack Christensen's death was an accident that falls within the AD&D coverage afforded by The Plan and therefore benefits should be awarded.

65. Defendants have denied Mrs. Christensen AD&D benefits.

66. Denial of benefits constitutes a breach of the Plan between Defendants and Mrs. Christensen as the beneficiary of Jack Christensen.

67. Defendants breach was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence and was clearly erroneous and in violation of § 503 of ERISA.

68. Defendants failed to act with the requisite care, skill, prudence, and diligence required under ERISA 404(a).

69. Sun Life's adverse benefit determination was based on a conflict of interest as Sun Life is the funding source and the payer of claims.

70. Defendants' decision was tainted by a structural conflict of interest that requires its decision be reviewed with increased skepticism.

71. Defendants' procedural violations of ERISA and its regulations require that its decision be reviewed with increased skepticism.

72. Mrs. Christensen seeks reimbursement and compensation for any and all benefits she would have received as a result of Defendants' failure to provide coverage in an amount presently unknown but to be determined at the time of trial.

73. As a direct and proximate result of the aforementioned conduct of the Defendants in failing to pay benefits to Mrs. Christensen, Mrs. Christensen has been damaged in an amount equal to the amount of benefits due under the terms of The Plan.

74. As a direct and proximate result of Defendants refusing to provide coverage and benefits upon the accidental death of Jack Christensen, Mrs. Christensen has suffered, and will continue to suffer, damages under The Plan, plus interest and other economic and consequential damages in an amount to be determined at trial.

75. Mrs. Christensen, as beneficiary of the benefits under The Plan, is entitled to payment of benefits, declaratory, injunctive and other appropriate equitable relief, together with prejudgment interest at the appropriate rate, attorneys' fees and costs.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against all Defendants)**

76. Mrs. Christensen incorporates and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

77. Defendants have denied and refused to provide benefits under the Plan to Mrs. Christensen in violation of Defendants fiduciary duties.

78. Defendants are fiduciaries within the meaning of 29 U.S.C. § 1001 et.seq., specifically 29 U.S.C. § 1002(21)(A), and are subject to the duties and liabilities set forth in 29 U.S.C. §§ 1104, 1105 and 1109.

79. 29 U.S.C. § 1104(a) specifically provides:

> A fiduciary shall discharge his duties with respect to a plan **solely in the interest of the participants and beneficiaries and** - for the **exclusive purpose** of: **providing benefits to participants and beneficiaries**; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter..." 29 U.S.C. section 1104(a) (Emphasis added.)

80. As alleged herein, Defendants have breached their fiduciary duties and obligations by purposefully interfering with Mrs. Christensen's rights to receive benefits under the Plan.

81. Defendants have breached their fiduciary duties and obligations by failing to make or authorize benefit payments to plan members, including Mrs. Christensen, at a time when Defendants knew or should have known that plan members, including Mrs. Christensen, were entitled to said benefits under the terms of the Plan.

82. Defendants have breached their fiduciary duties and obligations by unreasonably or arbitrarily withholding payments from plan members, including Mrs.

Christensen, in bad faith, knowing the plan members' claims, including Mrs. Christensen's claims, for benefits under The Plan to be valid.

83. Defendants have breached their fiduciary duties and obligations by unreasonably, arbitrarily and in bad faith failing to pay plan members benefits, including Mrs. Christensen, at a time when Defendants had sufficient information to justify payment.

84. Defendants have breached their fiduciary duties and obligations by unreasonably, arbitrarily and in bad faith failing to pay benefits to Mrs. Christensen without considering supporting information and data.

85. Defendants have breached their fiduciary duties and obligations by misrepresenting to plan members, including Mrs. Christensen, pertinent provisions relating to the Plan.

86. Defendants have breached their fiduciary duties and obligations to Mrs. Christensen by failing to provide a reasonable explanation of the basis relied upon in The Plan, in relation to the applicable facts, for the denial of claims for benefits.

87. Defendants have breached their fiduciary duties and obligations to Mrs. Christensenby knowingly and intentionally failing and refusing to abide by the terms of the Plan by relying upon standards, criteria and definitions which are not incorporated into the Plan.

88. Defendants' have breached their fiduciary obligations to discharge their duties with respect to the Plan solely in the interest of Mrs. Christensen or other

participants and beneficiaries and for the exclusive purpose of providing benefits to Mrs. Christensen and other participants and beneficiaries.

89. Defendants have failed to discharge their duties in accordance with the documents and instruments governing The Plan.

90. Mrs. Christensen is informed and believes, and based upon such information and belief alleges, that Defendants, in order to justify their imprudent, unlawful, unfair and unreasonable denials of benefits to Mrs. Christensen and other plan participants and beneficiaries, disregarded, misinterpreted, misrepresented and ignored the findings of qualified experts that demonstrate that benefits were owed.

91. Mrs. Christensen is informed and believes, and based upon such information and belief alleges, that Defendants, in order to justify their imprudent, unlawful, unfair and unreasonable denials of benefits to Mrs. Christensen disregarded, misinterpreted, misrepresented and ignored the findings of qualified experts that demonstrated Jack Christensen's death was an accident and therefore benefits were owed to Mrs. Christensen.

92. Upon information and belief, Defendants relied upon inappropriate exclusions in The Plan for the benefits sought by Mrs. Christensen, did not take into consideration all relevant evidence regarding Jack Christensen's death, and failed to adequately investigate utilizing qualified individuals in order to deny Mrs. Christensen's claim.

93. Mrs. Christensen is informed and believes, and based upon such information and belief alleges, that Defendants are continuing to breach their fiduciary responsibilities, obligations, and duties as alleged above.

94. Mrs. Christensen is informed and believes, and based upon such information and belief alleges, that Defendants' breach of fiduciary responsibilities is widespread practices under the Plan.

95. As a direct and proximate result of the conduct alleged herein, Mrs. Christensen has been injured by reason of the denial of a covered benefit under the Plan.

**COUNT III**
**ATTORNEYS' FEES AND COSTS**
**(Against all Defendants)**

96. Mrs. Christensen incorporates and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

97. 29 U.S.C. section § 1132(g)(1) authorizes this Court to award reasonable attorneys' fees and costs to either party in an ERISA action.

98. As a result of the actions of the Defendants, Mrs. Christensen has retained the services of legal counsel and has necessarily incurred attorneys' fees and costs in prosecuting this action.

99. Mrs. Christensen anticipates incurring additional attorneys' fees and costs in pursuing this action, all in a final amount which is currently unknown.

100. Mrs. Christensen therefore requests an award of reasonable attorneys' fees and costs but no less than $6,000.00 in the event of a default.

**PURSUANT TO RULE 38 OF THE FEDEDRAL RULES OF CIVIL PROCEDURE, PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

**PRAYER FOR RELIEF**

WHEREFORE, Mrs. Christensen prays for judgment as follows:

1. For a declaration regarding the Defendants' noncompliance with minimum requirements of ERISA and other federal and state laws in connection with the denial of benefits;

2. For benefits payable under the Plan to reimburse Mrs. Christensen for payments that Mrs. Christensen is entitled to receive;

3. For an award of prejudgment interest;

4. For an award of reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1);

5. For costs incurred;

6. For such other and further relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED this 28th day of June, 2011

LAW OFFICES OF MICHAEL J. WARD, PLC

By:s/Michael J. Ward
Michael J. Ward, Esq.
1300 N. McClintock Drive, Suite B-4
Chandler, Arizona 85226
Attorneys for Plaintiff

LOCASCIO LAW GROUP, PLLC

By:s/Kelly K. LoCascio
Kelly K. LoCascio, Esq.
9203 N. 127th Street
Scottsdale, Arizona 85259
Attorneys for Plaintiff